**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| **HERMAN M. BRAUDE, individually, and on behalf of all others similarly situated, 6006 Neilwood Drive Rockville, Maryland 20852**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PENN NATIONAL GAMING, INC. Wyomissing Professional Ctr. 825 Berkshire Blvd. , Suite 200 Wyomissing, PA 19610**<br><br>**and**<br><br>**Peter M. Carlino c/o PENN NATIONAL GAMING, INC. Wyomissing Professional Ctr. 825 Berkshire Blvd. , Suite 200 Wyomissing, PA 19610**<br><br>**and**<br><br>**William J. Clifford c/o PENN NATIONAL GAMING, INC. Wyomissing Professional Ctr. 825 Berkshire Blvd. , Suite 200 Wyomissing, PA 19610**<br><br>**Defendants.** | ) | **Civil No.: 0:08-CV-1752**<br>**Judge Roger W. Titus** |

## FIRST AMENDED CLASS ACTION COMPLAINT

**COMES NOW**, Plaintiff Herman M. Braude, for himself and all other persons similarly situated, on personal knowledge as to himself and his own activities, and as to all other matters, based upon review and analysis of the public filings by Defendants Penn National Gaming, Inc. ("Penn"), Peter M. Carlino ("Carlino") and William J. Clifford ("Clifford"), including Penn's

filings with the Securities and Exchange Commission ("SEC"), as well as review and analysis of news articles, press releases and analysts' reports by or relating to Penn, file this First Amended Complaint, by undersigned counsel, and allege as follows:

## THE PARTIES

1. Plaintiff Herman M. Braude is a citizen of the State of Maryland. The named Plaintiff brings this action on behalf of himself and all other persons similarly situated, namely, the shareholders of Defendant Penn National Gaming, Inc. who purchased their shares from March 20, 2008 to July 3, 2008, inclusive (the "Class Period").

2. During the relevant Class Period, Penn was a publicly-traded corporation listed on the NASDAQ National Securities Exchange and incorporated under the laws of the Commonwealth of Pennsylvania, having its principal place of business in the Commonwealth of Pennsylvania.

3. Carlino is the chairman and chief executive officer of Penn.

4. Clifford is the chief financial officer of Penn.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action and venue is proper pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., Rule 10b-5, promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5], which permits actions for securities fraud filed pursuant to § 10(b) to be brought in any district in which the Defendants transact business.

6. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(a), because Mr. Braude purchased his Penn shares by on-line transactions, using his Maryland brokerage account with Bank of America Investment Services.

7. This Court also has jurisdiction over this action, pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and the amount of controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

8. Venue is further proper in this Court, because Penn regularly transacts business in Maryland by transmitting live simulcasting from its racing facilities located in Grantville, Pennsylvania (Penn National Race Course) and Charles Town, West Virginia (Charles Town Races and Slots) to various off-track betting facilities throughout the State of Maryland, including, but not limited to, Laurel Park (located in Prince George's County), Pimlico Race Course (located in Baltimore City), the Cracked Claw Restaurant (located in Frederick County), the Cambridge Turf Club (located in Dorchester County) and Ocean Downs Race Track (located in Worchester County).

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

9. At all times herein mentioned, Mr. Braude was a shareholder of Penn. The shares owned by Mr. Braude, and the dates on which such shares were acquired, during the applicable class period, are listed in Mr. Braude's sworn certification, which is attached as Exhibit 1. The joinder of the remaining purchasers of stock or options during the period from March 20, 2008 through July 2, 2008, inclusive, is impracticable (the "Class"). Mr. Braude brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of himself and all such other purchasers of shares of Penn or to purchase shares of Penn options during the applicable class period and who were damaged thereby.

10. As of the filing of this original action, Mr. Braude owned 10,000 shares of Penn, having purchased a total of 37,500 shares during May and June 2008. This is an amount sufficiently high to warrant and insure active interest and participation by Mr. Braude in this

action, and the diligent and effective prosecution thereof. Mr. Braude, as representative of the class, will therefore fairly and adequately protect the interests of the class and of the individual members thereof.

11. Mr. Braude's claim is typical of the claims of the members of the class, as all members of the class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws complained of herein.

12. Mr. Braude does not have any interests that conflict with the interests of other class members.

13. The questions of law and fact common to the members of the class raised by this action predominate over any questions that affect or might affect only individual members of the class. Among the questions of law and fact common to the class are:

(a) whether the federal securities laws were violated by Defendants' acts and omissions, as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about Penn;

(c) whether the members of the Class have sustained damages and the proper measure of damages.

14. A class action is superior to any other available method for the fair and efficient adjudication of the controversy between the Class and Penn. Furthermore, as the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

15. This action presents questions of fact and law common to the entire class based on the misrepresentations and omissions of material facts made by Defendants, relating to an all cash buyout merger agreement originally announced on June 15, 2007 and subsequently terminated by agreement on July 3, 2008.

**GENERAL FACTUAL ALLEGATIONS**

16. Penn is a diversified, multi-jurisdictional owner and operator of gaming properties, including casinos, slot machine facilities, river boats, racing facilities and associated off-track wagering facilities.

17. Defendant Penn owns or operates 19 gaming properties located in Colorado, Florida, Illinois, Indiana, Iowa, Louisiana, Maine, Mississippi, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania, West Virginia, and Ontario. Penn also has obtained options to purchase land and facilities in Maryland to be exercised in the event that the state referendum passes to allow the operation of slot machines in the state.

18. In 2007 and 2008, and at all times during the subject class period, Mr. Braude was a shareholder of Penn. He purchased all of his shares on the NASDAQ Exchange, using his Maryland based on-line brokerage account with Bank of America Investment Services.

19. In May and the first half of June 2008, Mr. Braude purchased 37,500 additional shares of Penn on margin. *See*, Exhibit A of Exhibit 1. Due to margin calls that occurred during the latter part of June 2008, when Penn stock declined drastically in price, Mr. Braude was forced to sell more than 27,500 shares of Penn. As of the filing of this original action, Mr. Braude owned 10,000 shares of Penn.

**COUNT I**

**Securities Fraud Based Upon a Misrepresentation in Violation of Section 10(b) and/or Rule 10b-5 of the 1934 Securities Exchange Act**

20. Plaintiff Braude repeats the allegations in paragraphs 1 through 19, as if fully set forth herein.

21. On or about June 15, 2007, Defendants Penn and Carlino publicly announced via national press releases that Penn had entered into a definitive leverage Buyout Agreement by PNG Acquisition Company, Inc., an entity indirectly owned by certain funds managed by affiliates of Fortress Investment Group LLC (NYSE: FIG) and Centerbridge Partners, L.P. (collectively the "Purchaser"). *See*, a copy of Penn's June 15, 2007 press release attached hereto and incorporated herein as Exhibit 2.

22. Defendants further reported that the financing of the transaction was in place; Penn and the purchaser having obtained executed debt commitment letters from Deutsche Bank Securities, Inc., Deutsche Bank AG New York Branch, Wachovia Capital Markets, LLC, Wachovia Bank National Association and Wachovia Investment Holdings, LLC for over five billion dollars.

23. In the June 15, 2007 press release, Penn and Carlino represented that the buyout was targeted for completion by June 15, 2008, and the Company's shareholders would be entitled to receive $67.00 in cash, without interest, for each share of Penn common stock they own. Exhibit 2, p. 1.

24. Under the terms of the Agreement, which were reiterated in the June 15, 2007 press release (Exhibit 2), if the buyout/merger agreement was not completed by June 15, 2008 due to not receiving all the necessary state regulatory approvals a 120-day extension would be granted.

25. Defendants stated that "the merger agreement does not contain a financing condition. In addition, if the merger is not consummated by June 15, 2008, the per share purchase price will be increased by $0.0149 per day." Exhibit 2, p. 2.

26. Immediately following Defendants' June 15, 2007 press release, Penn's stock, which had been trading in low 50s, jumped to over $62.00 per share.

27. Pursuant to the November 7, 2007 proxy statement filed with the Securities and Exchange Commission (the "SEC"), the cash buyout/merger agreement did not contain a financing condition, since Deutsche Bank and Wachovia Bank made a firm commitment to Penn and the purchaser to underwrite approximately $7 billion of the underlying debt.

28. At a special meeting on December 12, 2007, existing stockholders approved the cash buyout/merger agreement, as contained in the Penn proxy statement filed with the SEC in November 2007.

29. From March 20, 2008 through the end of June 2008, through official press releases (Exhibit 3), Defendants issued frequent updates and announcements related to the planned buyout – all of them relating to securing transaction approval by various state regulatory gaming agencies of the proposed buyout/merger agreement, calculated to influence the investing public and shareholders that the buyout/merger transaction, as contained in the original SEC filings and the proxy statement was still in effect.

30. Despite Defendants' continual state regulatory approval updates and other affirmative representations, which spanned over three months (from March 20, 2008 to July 2, 2008), constituting assurances that the merger agreement was intact as is, Defendants knew or had reason to believe that the proposed cash buyout/merger transaction would not take place under the terms of the June 15, 2007 agreement, as Defendants were involved in extensive

discussions and negotiations between the Purchaser, financing banks, and their respective representatives to either renegotiate the buyout price or terminate the buyout/merger agreement in its entirety. During the period from March 20, 2008 through July 2, 2008 inclusive, Defendants never informed or apprised the investing public of such material developments (ongoing termination and/or renegotiation discussions).

31. Rather than disclosing information concerning these ongoing merger termination discussions, Defendants, from March 20, 2008 to July 2, 2008 in published press releases consistently and repeatedly issued positive, affirmative statements about the pending buyout/merger, which Mr. Braude, a long-time Penn shareholder and investor, very closely monitored and reasonably relied upon.

32. Relying upon Defendants' continual updates of state regulatory approvals and misleading statements issued from March 20, 2008 through July 2, 2008 indicating the likelihood that the buyout/merger would be consummated, Mr. Braude continued to hold on to his existing Penn shares and even purchased additional shares.

33. Specifically, on March 20, 1998, Defendants announced that Penn secured transaction approval from the West Virginia Lottery Commission.

34. On April 15, 2008, Defendants announced that Penn secured transaction approval from the New Mexico Gaming Control Board.

35. On April 16, 2008, Defendants announced that Penn secured transaction approval from the Pennsylvania State Horse Racing Commission and New Mexico Racing Commission.

36. On April 17, 2008, Defendants announced that Penn secured transaction approval from the Mississippi Gaming Commision.

37. On May 15, 2008, Defendants announced that Penn secured transaction approval from the West Virginia Racing Commission.

38. On May 29, 2008, Defendants announced that Penn secured transaction approval from the Pennsylvania Gaming Control Board.

39. On June 5, 2008, Defendants announced that Penn secured transaction approval from the Iowa Racing and Gaming Commission.

40. In a June 6, 2008 press release (Exhibit 4), Defendants announced that Penn was extending its merger end date by 120 days, from June 15, 2008 to October 13, 2008, in order to secure the approval of the remaining four states, having received all other state gaming regulatory approvals needed.

41. Based on information initially revealed in a Penn's SEC 8-K filing with the SEC on July 9, 2008, in April, May and June of 2008, Penn was negotiating and/or consulting with the principals of the Purchaser, the financing banks, their intermediaries, and other advisers, and entered into various Letters of Agreements, commencing in May 22, 2008 (with various amendments thereafter), forming a new agreement to terminate the proposed buyout/merger.

42. Defendants did not previously disclose the potential merger termination to the investing public or, in any way, indicate to the investing public that the Purchaser and/or banks were seeking to materially renegotiate the buyout price and/or terminate the previously announced, published and stockholder approved cash buyout/merger agreement.

43. Upon information and belief, the various financing institutions of Deutsche Bank and Wachovia became less and less inclined to take on more leveraged debt, and they actively pursued negotiations, attempting to modify and/or unravel the original buyer/merger transaction with Defendants for months prior to reaching the final settlement and termination agreement

with Defendants. *See*, Exhibit 5, the Form 8-K filing, specifically, seq. 5, Ex 10.1 and seq. Ex. 10.2, entitled, "Stock Purchase Agreement" and "Termination and Settlement Agreement". Page 10 of Ex 10.2 of the SEC 8-K filing entitled, "Termination and Settlement Agreement" indicates that the parties entered into 11 Letter Agreements or modification discussions between May 22, 2008 and June 29, 2008, outlining the agreements-in-principle, constituting the Termination and Settlement Agreements between the numerous parties and/or entities (the Purchaser, lenders and investors) involved.

44. Upon information and belief, after months of undisclosed negotiations between the Defendants, Purchaser, the financing banks, as well as with each party's respective advisors and counsel, the parties agreed to terminate the merger agreement and officially issued an announcement in press releases on the morning of July 3, 2008, before the market opened.

45. In a complicated transaction between the financing banks, Purchaser and Defendants, the financing banks agreed to pay Penn a "cash termination fee" of $225 million, plus a $1.25 billion zero coupon preferred equity investment (interest-free loan) for seven years. In return, for the new capital investment of $1.25 billion, the banks and/or Purchaser would receive 12,500 shares of newly issued Preferred Penn stock as security for the $1.25 billion loan.

46. Defendants deliberately elected not to disclose or apprise the investing public that the original buyout/merger agreement was ever in jeopardy or that termination or modification negotiations were taking place in order to keep Penn share prices artificially inflated. Rather, Defendants actively and intentionally published press releases and affirmative statements, leading the investing public, Mr. Braude and other Penn shareholders to believe that the original buyout/merger agreement was actively pending, and the "End Date" for closing of the buyout/merger agreement was merely being extended for a period of 120 days, from June 15,

2008 to October 13, 2008, in order to secure the remaining state regulatory authority approvals of the original buyout/merger transaction. *See*, Exhibit 4, Penn's press release, dated June 6, 2008, entitled, "Penn Gaming Extends Merger End Date."

47. These affirmative misrepresentations, along with the concealments of the ongoing negotiations and discussions held between Defendants, the Purchaser entities and the financing banks during April, May and June of 2008 (which led to various Letter Agreements entered into by the parties in the later part of May 2008, with amendments throughout June 2008) influenced Mr. Braude and the Class to retain and/or purchase additional Penn shares.

48. After Penn abruptly announced that its planned $5.82 billion buyout by Fortress Investment Group LLC and Centerbridge Partners, L.P. had been terminated, on July 3, 2008, after the public termination announcement, shares of Penn fell to a new low: the mid-20s.

49. Penn also announced, on July 3, 2008, that as a result of the settlement and termination, it would be receiving $1.475 billion as a cash infusion, which would consist of a $225 million cash termination fee and the sale of $1.25 billion of Penn's redeemable preferred equity due in June 2015 (effectively, a seven-year, interest-free $1.25 billion loan from Fortress, Centerbridge, Wachovia Corp and Deutsche Bank).

50. Upon information and belief, Defendants knew or had reason to know that the original buyout/merger agreement was in jeopardy in the early Spring of 2008, as Defendants were engaging in discussions which made the termination of the buyout/merger transaction a probability, and Defendants or other parties to the transaction leaked inside information to favored, close associates. This information and belief is based upon the substantial increase in the number of shares being traded in May and June 2008 where the price fluctuated from the high 40s down to the low 30s. This increased trading volume by apparent insiders accelerated in

the last two weeks or 10 trading days prior to the July 3, 2008 public announcement that the original merger agreement was terminated. During these 10 trading days, prior to the July 3rd announcement, Penn stock fell by more than 25 percent (25%).

51. Upon information and belief, after being approached by the banks who issued commitment letters back in 2007, and the Purchaser, in the Spring of 2008, but before the official termination announcement to the investing public, these favored few insiders and/or close associates began rapidly selling Penn's stock.

52. According to published records, in April 2008, it was reported that 14,387,298 shares of Penn stock were traded, and the price fell from a high of $45.65 to a low of $39.31.

53. In May 2008, it was reported that 22,678,972 shares of Penn stock were traded, and the price fell from a high of $46.49 to a low of $40.59.

54. In June 2008, it was reported that 25,176,445 shares of Penn stock were traded, and the price fell from a high of $46.72 to a low of $31.82.

55. More notably, in just a 10-day trading period, from June 19, 2008 through July 2, 2008, before the public termination announcement, it was reported that 17,816,144 shares of Penn stock were traded, and the price plummeted from a high of $42.07 to a low of $28.20, indicating that preferred insiders who knew of the probability of the termination agreement were either selling or shorting Penn shares.

56. Consequently, after reaching the undisclosed termination letters agreements-in-principle, starting in late May, trading volumes increased from May 22, 2008 through July 3, 2008, and the price of Penn's stock began to steadily and significantly deteriorate.

57. From March 20, 2008 to July 2, 2008, Penn was publicly announcing status of approval by the various states in order to fraudulently keep inflated its stock market price by

instilling in the investing public the false hope and belief that the original buyout/merger agreement was still going to take place.

58. By concealing material information concerning the termination negotiations, Defendants were artificially manipulating the open market price and obstructing the operation of the market as indices of the stock's true value for the Defendants' own gain.

59. Defendants' misrepresentations concerning the buyout/merger agreement concerned material facts.

60. Defendants made the misrepresentations knowingly, or with reckless disregard for the truth thereof, and with the intent to deceive or defraud the investing market public.

61. Defendants made the misrepresentations by means of publishing press releases on the internet (company website: pngaming.com) and other instrumentalities of interstate commerce.

62. At the time of said misrepresentations, Mr. Braude and the other members of the Class were ignorant of their falsity, and relied upon the representations to be true and accurate, not misleading. Had Mr. Braude and other members of the Class known of the ongoing negotiations, discussions, and the possibility or likelihood of the termination or modification of the pending merger agreement, in the Spring of 2008, Mr. Braude, and the other members of the Class would not have retained their Penn stock and certainly would not have purchased on the open market additional Penn stock on the belief that the shares would be bought out for a cash payment of $67 within the near future (summer or fall of 2008, at the latest).

63. As a result of the Defendants' actions, Mr. Braude suffered damages in the amount of approximately $500,000.

64. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5.

65. As a direct and proximate result of Defendants' wrongful conduct, reckless disregard for the truth, and as a consequence of reasonably relying on Defendants' material misrepresentations, Mr. Braude and the other class members suffered damages in connection with their purchases of Penn's stock during the Class Period in an amount to be determined at trial.

**COUNT II**

**Securities Fraud Based Upon Omission or Failure to Disclose in Violation of Section 10(b) and/or Rule 10b-5 of the 1934 Securities Exchange Act**

66. Plaintiff Braude repeats the allegations in paragraphs 15 through 65, as if fully set forth herein.

67. From March 20, 2008 through July 2, 2008, Defendants failed to disclose to the investing public that the proposed buyout was in jeopardy, or that negotiations were being held concerning the termination of the buyout/merger agreement.

68. Defendants' omission or failure to disclose concerned material facts that significantly affected the value of Penn shares.

69. Defendants made the material omissions knowingly, or with reckless disregard for the truth thereof, and with the intent to deceive or defraud the investing public and the market.

70. Defendants made the material omissions in connection with the publically announced and stockholder approved buyout/merger agreement.

71. Defendants made the material omissions and affirmative misrepresentations by means of publishing misleading press releases on the internet (company website: pngaming.com) and other instrumentalities of interstate commerce.

72. Defendants owed Mr. Braude and the rest of the investing public a duty to disclose material information regarding negotiations and tentative agreements-in-principle, terminating the previously approved merger. *See*, Article V, Section 5.8(c) (or, p. 10) of the Termination and Settlement Agreement attached hereto and incorporated herein as Exhibit 2.

73. Mr. Braude reasonably relied to his detriment on the information conveyed publicly by the Defendants from March 20, 2008 through July 2, 2008, which indicated that the buyout/merger agreement would go forward.

74. Mr. Braude held on to his shares, as well as purchased additional shares during the Class Period, in reasonable reliance upon that information, which was materially false, as Defendants, along with several parties and advisors involved in the proposed transaction, were secretly negotiating a termination of the buyout beginning in the Spring of 2008.

75. Defendants' omission created a material misimpression, which induced Mr. Braude and the Class to purchase the security at issue during the Class Period.

76. As a direct and proximate result of Defendants' wrongful conduct, Mr. Braude and the other Class Members suffered monetary damage in connection with the purchase of Penn stock in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Herman M. Braude, prays that judgment be entered against Defendants Penn National Gaming, Inc., Peter M. Carlino and William J. Clifford, as follows:

1. A judgment against Defendants Penn, Carlino and Clifford, jointly and severally, in an amount to be proven at trial, but no less than $75,000.00;

2. For an award of pre-judgment and post-judgment interest in the maximum amount permitted by law, court costs, expert costs and reasonable attorneys' fees;

3. That this action be certified as a class action on behalf of the proposed class, as described herein and that counsel of record be appointed to represent the class;

4. For an award of compensatory and punitive damages, as the Court deems appropriate; and

5. For such other and further relief as the Court deems appropriate.

**JURY DEMAND**

6. Plaintiff Herman M. Braude hereby requests a trial by jury on all issues so triable.

Signed this 6th day of August, 2008.

Herman M. Braude, Esq., Bar No. 02573
Gina Jun, Esq., Bar No. 14896
Michelle Daley, Esq. Bar No. 17428
Braude & Margulies, P.C.
1200 Potomac Street, N.W.
Washington, D.C. 20007
Tel: (202) 471-5400
Fax: (202) 471-5404
gjun@braudemargulies.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Herman M. Braude, hereby certify that I have mailed a copy of the foregoing Amended Complaint, via U.S. Mail, postage pre-paid on this 6th day of August, 2008 to the following counsel:

Kevin B. Collins, Esq.
Anna C. Haac, Esq.
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
*Attorneys for Defendant*
*Penn National Gaming, Inc.*

Herman M. Braude